# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| STEVE KING, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | 04 C 7796 |
| ) | Judge Blanche M. Manning |
| CITY OF CHICAGO, ) | |
| ) | |
| Defendant, ) | |

## MEMORANDUM AND ORDER

Steve King enjoyed his job driving trucks for the City of Chicago except for the regular taunting by his supervisor, who allegedly unleashed upon him a series of racial epithets including "coon," "sambo," and "black Otis." No longer able to contain himself, King eventually responded with a series of profanities hurled at the supervisor, who suspended him. After that, King was disciplined for a variety of violations of workplace policies and was eventually terminated.

King now sues the city, contending that he was subjected to a hostile work environment on account of his race, was treated less favorably than employees who were not African-American, and that some of the discipline (including his termination) was in retaliation for reporting the discrimination he endured, all in violation of Title VII of the Civil Rights Act of 1964. *See* 42 U.S.C. § 2000e, *et seq*. In response, the city has moved for summary judgment, arguing that the alleged taunting was not hostile, that King cannot establish a *prima facie* case of disparate treatment, and that King cannot establish a causal connection between his complaints of discrimination and his allegedly retaliatory suspensions and discharge. For the reasons that follow, the court grants in part and denies in part the motion for summary judgment.

**BACKGROUND**

The following facts are undisputed except where noted. Starting in 2001, King's supervisor, Arthur Vanick, repeatedly subjected King to "numerous racial slurs and inflammatory racial comments," including "coon," "sambo," and "Otis" or "Black Otis," a reference to a "dysfunctional" character on the Andy Griffith show who "sleeps in a jail cell."[1] (Defendant's Response to King's Rule 56.1 Statements of Fact at ¶ 2.) Vanick also told King that "You people not only are coons. You eat coons." *(Id.* at ¶ 9.) During a meeting of truck drivers and tree trimmers in March 2002, Vanick likened King's prospects of being a supervisor to "you people being promised 40 acres and a mule." (Deposition of Steve King (attached as exhibit F to Defendant's Exhibits in Support of its Motion for Summary Judgment) at 141:18 - 144:8.) Vanick referred to King as Otis not only in his presence, but also over the two-way radio in city-owned trucks, which was overheard by other employees. Vanick directed racial remarks at King daily.

By May 2002, King had had enough. On May 7, he told Vanick to "f*** off," and called him an "ass****" three times in the presence of other employees. Vanick responded by suspending King for three days. King subsequently filed a union grievance about the suspension. He received a hearing, but the suspension was upheld.

On June 5, 2002, King complained about the suspension a second time in a letter to a union official. In the letter, he also complained about Vanick's use of racial epithets. King

---

[1] The City has objected to the statements from which the facts detailed in this paragraph were pulled. The court has carefully reviewed the record and found the statements amply supported. Accordingly, the city's objection that the statements are "argumentative, conclusory, and not factually based" are overruled.

followed that complaint with a letter to the city's personnel department on June 20, 2002. In that letter, King again complained about Vanick's use of the phrases "Otis" and "40 acres and a mule." That same day, King received a second three-day suspension after supervisor Gary Belak caught him watching a portable television in his city-owned truck. King admits knowing that city policy prohibited drivers from having portable televisions in their trucks, but denies that he was watching television in his truck. However, his denial is not supported by the cited portion of the record and therefore the fact is deemed admitted.

The following day, King received yet another suspension. The parties dispute what circumstances led to the suspension. According to the city, Vanick suspended King for being "belligerent and insubordinate." (Deposition of Steve King at 161:17 - 162:7.) King tells a very different story. According to King, Vanick followed King in a "menacing way" and refused to stop even after King reported him to a different supervisor. (*Id.* at 163:9-11.) Later that day, King wrote a second letter to the city's personnel department, updating his letter of June 20 to complain about his newest suspension. He also repeated his complaints in a July 3 letter to Streets and Sanitation Commissioner Al Sanchez. King was disciplined again in September 2002, when he received an oral warning for failing to wear a safety vest, and in November 2002 when he received a 1-day suspension for detaining fellow employees without authorization in an attempt to hold a meeting.

On December 4, 2002, the plaintiff filed a complaint of discrimination with the Illinois Department of Human Rights and the EEOC. The filing of King's complaint was followed by a rapid-fire series of additional suspensions. On December 10, 2002, he received two separate suspensions for incidents that had occurred earlier. The first suspension was for 1 day for failing

to tell a supervisor on November 25, 2002, that he was leaving his truck to go to the bathroom. The second suspension was for 2 days for arriving to work late, failing to report to a supervisor, and for driving off in his city-owned truck without authorization, all of which had allegedly occurred on December 3, 2002. King denies some of the conduct and offers innocent explanations for the rest.

On December 20, 2002, supervisor Thomas Augustyniak suspected that King was drunk when he showed up to work glassy-eyed, slurred his speech, and smelled strongly of alcohol. At Augustyniak's request, Vanick observed King and also suspected that he was drunk. Augustyniak then told King to report for a drug and alcohol test, which the city contends King refused. The city contends that King then struck Augustyniak and verbally assaulted him by threatening to "f*** you, b****, I will f*** you up." King admits using profanity, but denies being drunk, refusing the drug and alcohol test, or assaulting Augustyniak.

Later that day, the city delivered to King a letter placing him on paid administrative leave until further notice. On January 21, 2003, Commissioner Sanchez sent him another letter detailing potential bases for dismissing him (refusing the drug test and assaulting his supervisor) and giving him the opportunity to respond. On January 31, 2002, the commissioner of the Streets and Sanitation department wrote to King terminating him immediately. King appealed to the city's personnel board, but the board upheld King's termination.

King filed a second charge of discrimination with the EEOC and Illinois Department of Human Rights in July 2003. The EEOC issued a right-to-sue letter August 31, 2004.

In the instant suit, King alleges six counts of racial discrimination under Title VII. In Count I, he alleges that the racial slurs he endured created a hostile work environment. In Count

to tell a supervisor on November 25, 2002, that he was leaving his truck to go to the bathroom. The second suspension was for 2 days for arriving to work late, failing to report to a supervisor, and for driving off in his city-owned truck without authorization, all of which had allegedly occurred on December 3, 2002. King denies some of the conduct and offers innocent explanations for the rest.

On December 20, 2002, supervisor Thomas Augustyniak suspected that King was drunk when he showed up to work glassy-eyed, slurred his speech, and smelled strongly of alcohol. At Augustyniak's request, Vanick observed King and also suspected that he was drunk. Augustyniak then told King to report for a drug and alcohol test, which the city contends King refused. The city contends that King then struck Augustyniak and verbally assaulted him by threatening to "f*** you, b****, I will f*** you up." King admits using profanity, but denies being drunk, refusing the drug and alcohol test, or assaulting Augustyniak.

Later that day, the city delivered to King a letter placing him on paid administrative leave until further notice. On January 21, 2003, Commissioner Sanchez sent him another letter detailing potential bases for dismissing him (refusing the drug test and assaulting his supervisor) and giving him the opportunity to respond. On January 31, 2002, the commissioner of the Streets and Sanitation department wrote to King terminating him immediately. King appealed to the city's personnel board, but the board upheld King's termination.

King filed a second charge of discrimination with the EEOC and Illinois Department of Human Rights in July 2003. The EEOC issued a right-to-sue letter August 31, 2004.

In the instant suit, King alleges six counts of racial discrimination under Title VII. In Count I, he alleges that the racial slurs he endured created a hostile work environment. In Count

II, he alleges that employees outside his protected class were not suspended for watching television in their city-owned trucks or for failing to wear safety gear, as he was in June and September of 2002. In Count III, King alleges that the suspensions and warnings he received beginning in June 2002 were in retaliation for complaints he filed with the city's personnel department, the Illinois Department of Human Rights, and the EEOC. In Counts IV and V, King alleges that his termination in January 31, 2003, was retaliatory and amounted to disparate treatment. Count VI, in which King alleged a violation of his First Amendment rights to free speech and free association, was previously dismissed.

## ANALYSIS

### A. Summary Judgment Standard

Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of any material fact." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Valenti v. Qualex, Inc.,* 970 F.2d 363, 365 (7th Cir. 1992), *citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Moreover, a court should grant a motion for summary judgment only when the record shows that a reasonable jury could not find for the nonmoving party. *See Valenti,* 970 F.2d at 365; *see also Anderson,* 477 U.S. at 248.

Thus, in order to withstand a motion for summary judgment, the nonmoving party must show that a dispute about a genuine material fact exists; that is, the evidence is such that a reasonable jury could render a verdict for the nonmoving party. *See Anderson,* 477 U.S. at 248.

The nonmoving party may not merely rest upon the allegations or details in his pleading, but instead, must set forth specific facts showing that there is a genuine issue for trial. *See Celotex,* 477 U.S. at 322; *Anderson,* 477 U.S. at 248.

The determination as to what facts are "material" in employment discrimination cases depends upon the substantive law of employment discrimination, and the burden of proof applicable under the law. *See Williams v. Williams Elecs., Inc.,* 856 F.2d 920, 922 (7th Cir. 1988). When considering motions for summary judgment in discrimination cases, the court applies these criteria with added rigor because the matters of intent and credibility are crucial issues. *See Sarsha v. Sears, Roebuck, & Co.,* 3 F.3d 1035, 1038 (7th Cir. 1993).

**B.  Hostile Work Environment (Count I)**

To survive a motion for summary judgment on a hostile work environment claim, a plaintiff must identify evidence that shows: (1) he was subject to unwelcome harassment; (2) the harassment was based upon his membership in a protected class; (3) the harassment was so severe or pervasive as to alter the conditions of his working environment by creating a hostile or abusive situation; and (4) there is a basis for employer liability. *See Beamon v. Marshall & Ilsley Trust Co.*, 411 F.3d 854, 863 (7th Cir. 2005). The only element that the city contends King has failed to meet is the third. Specifically, the city argues that King has failed to show that the harassment was objectively hostile, or that it altered the conditions of his working environment.

In order to determine whether the environment the plaintiff has described was objectively hostile, the court must take into account all of the circumstances "including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work

performance." *Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1045 (7th Cir. 2002). No "magic number" of racial slurs or epithets must be met in order to be considered pervasive. *See Shanoff v. Ill. Dept. of Human Servs.*, 258 F.3d 696, 704 (7th Cir. 2001). Even isolated, or stray, offensive utterances may be objectively hostile if severe or when viewed in the cumulative. *Cerros*, 398 F.3d at 951 ("[T]he fact that each individual epithet may have appeared in isolation does not undo their cumulative effect").

King has easily met the objective component of the hostile work environment inquiry. He was repeatedly berated with unambiguously racial epithets such as "coon," "sambo," and "forty acres and a mule." A pattern of derogatory remarks that separate African-Americans from every employee outside the protected class is objectively hostile. *See Starks v. George Court Co.*, 1988 WL 82592 (N.D. Ill. Aug. 3, 1988) (use of words like "coon" can be discriminatory *per se*); *Bailey v. Binyon*, 583 F. Supp. 2d 923, 927 (N.D. Ill. 1984) ("The use of the word 'nigger' automatically separates the person addressed from every non-black person; this is discrimination *per se*"). Other phrases such as "black Otis" and "you people," even if not overtly racially derogatory, nevertheless add to the cumulative effect of a hostile work environment. *See Doe v. R. R. Donnelley & Sons, Inc.*, 42 F.3d 439, 444 (7th Cir. 1994) (a court must carefully evaluate all the incidents alleged in order to adequately gauge their cumulative effect).

Alternatively, the city argues that the racial harassment was not so severe or pervasive that it left him unable to perform his job or resulted in any adverse employment action. In support, the city cites portions of King's deposition testimony in which he described himself as a excellent employee. Notwithstanding King's favorable self-assessment of himself, the city's argument is simply unsupported by the evidence. It is undisputed that King was suspended and

ultimately terminated, and King has identified ample evidence that the environment in which these events occurred was racially-charged. Thus, the circumstances surrounding King's termination are a far cry from those that surrounded the terminations in the case the city relies upon, *Luckett v. Menasha Material Handling Corp.*, No. 01 CV 8967, 2005 WL 2420398 (N.D. Ill. Sept. 25, 2005). In *Luckett*, the plaintiffs failed to show that their poor job performance was attributable to unlawful harassment because the hostilities they described—not receiving company t-shirts, being denied a shortcut to lunchroom, and not being able to combine lunch breaks with afternoon breaks—were the result of the department in which they worked, not their race. *Id.* at *19. The instant case is distinguishable because slurs like the ones King endured were overtly racial, and therefore have a much more offensive impact than being denied a t-shirt or shortcut to the lunch room. *See Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 477 (7th Cir. 2004) ("Given American history, we recognize that the word "nigger" can have a highly disturbing impact on the listener"); *Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993) ("no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates." ) (internal citation omitted). A reasonable jury could conclude that the epithets "coon," "sambo," and "forty acres and a mule" were offensive enough to make King's work environment sufficiently hostile. Accordingly, the city is not entitled to summary judgment on King's hostile work environment claim (Count I).

Inexplicably, the city also argues that King's hostile work environment claim is barred by the statute of limitations. The court need not address this argument because it previously rejected the argument when denying the city's motion to dismiss.

## II. Disparate Treatment (Counts II and V)

Next, the city argues that King failed to establish a *prima facie* case of disparate treatment under either Count II (based upon the warning he received for not wearing a safety vest and a suspension for having a television in his truck) or Count V (based upon his termination). To survive the motion, King may proceed under either the direct or the indirect method of proof. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 (1973). The parties have proceeded only under the indirect method; so too will the court.

In order to establish a *prima facie* case of disparate treatment under the indirect method, the plaintiff must show that: "(1) []he is a member of a protected class; (2) []he was meeting her employer's legitimate expectations; (3) []he suffered an adverse employment action; and (4) other similarly-situated employees who were not members of the class were treated more favorably." *Wells v. Unisource Worldwide, Inc.*, 289 F.3d 1001, 1006 (7th Cir. 2002). If the plaintiff establishes a *prima facie* case, the burden of proof shifts to the employer to produce evidence of a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* If the employer proffers such a reason, the burden shifts back to the plaintiff to demonstrate that the reason proffered is pretextual. *Id.* A pretextual reason means more than an unusual act or a business error; "pretext means deceit used to cover one's tracks." *Id.*

### A. Disparate Treatment Based Upon the Oral Warning and the Suspension (Count II)

In Count II, King alleges disparate treatment based upon the oral warning he received for failing to wear a safety vest, and the three-day suspension he received for having a television in

his city-owned truck. King contends that white coworkers committed similar infractions, but were not disciplined.

The city contends that King cannot establish the second (legitimate expectations), third (adverse employment action), and fourth (similarly-situated) prongs of his *prima facie* case, and therefore it is entitled to summary judgment. In support, the city first argues that King cannot establish that he was meeting its legitimate expectations because he admits that he did not wear a safety vest and had a television in his truck, both of which violated the work rules. *See Luckett v. Menasha Material Handling Corp.*, No. 01 CV 8967, 2005 WL 2420398, at *13 (N.D. Ill. Sept. 29, 2005) ("As a general rule, an employee's admission that he violated a work rule is enough to establish that an employee did not meet his employer's legitimate expectations.") However, when a plaintiff alleges that the employer applied its expectations in a discriminatory manner, the second and fourth prongs of the *prima facie* analysis merge. Under that scenario, the plaintiff may survive summary judgment merely by showing that similarly-situated employees who also failed to meet the employer's legitimate expectations were treated more favorably. *Pantoja v. American NTN Bearing Mfg. Corp.*, 495 F.3d 840, 846 (7th Cir. 2007). Therefore, the court will turn to whether King has identified any employees outside the protected class who also violated the work rules but were not disciplined.

In order to show that similarly-situated white employees were treated more favorably than him, King relies upon the deposition testimony of himself as well as coworker Julis Brittman. Brittman testified that "a lot of white guys" did not wear safety vests but did not receive oral warnings, including Paul Mikowski, Brian Fitzgerald, and someone named Lacy. (King's Memorandum in Opposition to Motion for Summary Judgment, Ex. 1 at 34-37.) As for King's

suspension, both King and Brittman testified that some white employees had a television or radio in their truck but were not disciplined when caught. (*Id*. at 10, Ex. 1 at 8-9, 37-38.)

The city objects to the admissibility of the testimony of King and Brittman. Specifically, the city argues that neither King or Brittman laid a foundation for knowing the disciplinary history of other employees. As the city correctly notes, neither of them testified that they had reviewed the disciplinary files of other employees or set forth any other basis for knowing whether or not the white employees they identified had ever been disciplined. (*Id.* at 36-38.) Furthermore, Brittman could not identify by name any white employee who was not disciplined for having a television in their city-owned truck. (*Id.* at 37-38.)

A plaintiff may survive summary judgment only by identifying evidence that would be admissible at trial. *See Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007). To be admissible, a witness' testimony must be based upon personal knowledge. *See* Fed. R. Evid. 602 ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter"). Here, neither King nor Brittman has identified any basis for knowing the disciplinary history of other employees. Therefore, their testimony lacks foundation, would be inadmissible at trial, and consequently does not establish that similarly-situated employees outside King's protected class were treated more favorably. Because King cannot establish the fourth prong of his *prima facie* case, the court need not address whether he met the third prong (adverse employment action).

Even if King had established a *prima facie* case, he has failed to address whether the city's proffered reasons for disciplining and terminating him were pretextual. Once the city identified nondiscriminatory reasons for its conduct (King's violation of multiple work rules), the

burden shifted to King to show that the city's nondiscriminatory reasons were not the real reasons he was disciplined and terminated. *See Wells*, 289 F.3d at 1006. But King failed even to address the issue of pretext. He has therefore forfeited any argument on this critical element of the *McDonnell-Douglas* analysis. *See Salas v. Wisconsin Dep't of Corr.*, 493 F.3d 913, 924 (7th Cir. 2007) (a party forfeits any argument it fails to raise in its brief opposing summary judgment).

In sum, King has produced no admissible evidence to establish that other similarly-situated employees who were not in his class received favorable treatment, and therefore cannot establish a *prima facie* case of disparate treatment under the *McDonnell-Douglas* indirect method of proof. Furthermore, he has forfeited any argument that the city's conduct was a pretext for discrimination because he failed to address the issue in his brief. Accordingly, the city is entitled to summary judgment on Count II.

### B. Disparate Treatment Based Upon Termination (Count V)

In his response to the city's motion for summary judgment, King does not even attempt to identify a similarly-situated employee outside his protected class who was treated more favorably, *i.e.*, engaged in conduct similar to his but was not terminated. Instead, he argues that he has identified a genuine issue of material fact, specifically the dispute over whether he actually engaged in the conduct for which he was terminated.

King has misstated the standard for summary judgment under the indirect method of proving disparate treatment. Under *McDonnell-Douglas*, the parties successfully navigate the shifting burdens by identifying genuine issues of material fact at each step. For instance, the plaintiff must first identify a genuine issue of material fact for each prong of its *prima facie* case. *See Kampmier v. Emeritus Corp.*, 472 F.3d 930, 940 (7th Cir. 2007). If he succeeds, the

employer must then proffer a nondiscriminatory reason for the adverse employment action and, if it does, the burden returns to the plaintiff to identify a material dispute over whether the employer's reason was actually a pretext for discrimination. *See Merillat v. Metal Spinners, Inc.*, 470 F.3d 685, 692 (7th Cir. 2006).

Nevertheless, King argues that the mere fact that he has identified a disputed fact about pretext (*i.e.*, whether he engaged in the conduct for which he was terminated) allows him to do an end run around the prerequisite that he establish a *prima facie* case, citing in support *EEOC v. Target Corp.*, 460 F.3d 946 (7th Cir. 2006). In *Target*, the Seventh Circuit reversed the district court's entry of summary judgment in favor of the employer because the plaintiff had raised a genuine issue of material fact about whether the employer's reason for terminating was pretextual. *Id.* at 960-61. However, nothing in *Target* excuses a plaintiff who raises a genuine issue of material fact about pretext from first raising genuine issues of material fact about every element of his *prima facie* case. To the contrary, before the Seventh Circuit even reached the issue of whether the plaintiff had raised an issue of material fact about pretext, it focused first on whether the plaintiff had establish a *prima facie* case. *Id.* at 959-60.

Therefore, in order to survive summary judgment, King, like all plaintiffs who rely on the indirect method to prove disparate treatment, must navigate each step of the indirect method, including establishing a *prima facie* case. King failed to do so by not even attempting to identify any similarly-situated, more favorably treated employees. Accordingly, he has not set forth a *prima facie* case and the city is entitled to summary judgment on Count V.

### III.     Retaliation (Counts III and IV)

The parties' briefs are confusing on the issue of King's retaliation claims in Count III (arising from a suspension in May 2002 and a written reprimand in July 2002) and Count IV (arising from his suspension in December 2002, which led to his termination in January 2003). In particular, King's brief sets forth the analysis of a retaliation claim only under the direct method as if the indirect method does not exist. To avoid further confusion, the court will focus first on the two methods for surviving summary judgment that are available to plaintiffs who have alleged retaliation.

First, a plaintiff may proceed under the direct method by showing: (1) that he was engaged in a statutorily protected activity; (2) that he suffered an adverse employment action; and (3) a causal connection between the two. *See Brown v. Illinois Dep't of Natural Resources*, 499 F.3d 675, 684 (7th Cir. 2007). Although the method is called direct, a plaintiff is not limited to relying on direct evidence; to the contrary, the plaintiff may rely on either direct or circumstantial evidence. *See Dorsey v. Morgan Stanley*, No. 05-2946, 2007 WL 3307086, at *3 (7th Cir. Nov. 9, 2007) (plaintiff may show elements of retaliation under the direct method using either direct or circumstantial evidence).

Alternatively, the plaintiff may proceed under the indirect method by establishing a *prima facie* case with evidence that: (1) he was engaged in a statutorily protected activity; (2) he was meeting his employer's legitimate expectations; (3) after engaging in the protected activity, he suffered an adverse employment action; and (4) similarly situated employees who were not engaged in a protected activity were not subjected to the adverse employment action. *Brown*, 499 F.3d at 684. If the plaintiff establishes a *prima facie* case, the burden then shifts to the

employer to identify a nondiscriminatory reason for the adverse employment action. *Id.* If the employer succeeds, the burden returns to the plaintiff to show that the employer's reason was really just pretext. *Id.*

King never mentions the indirect method. As a consequence, he never attempts to prove that the city's reasons for disciplining and ultimately terminating him were a pretext for discrimination. He does name two employees he contends were similarly situated, but as discussed above in the section addressing King's disparate treatment claims, his evidence about similarly situated employees lacks foundation and is inadmissible. As a result, King cannot succeed under the indirect method.

Therefore, King may survive summary judgment only under the direct method. The parties appear to concede that King has established the first two prongs. Under prong one, the city does not dispute that King engaged in a protected activity on two occasions: (1) on June 20, 2002, when he wrote a letter to the city's personnel department complaining that his supervisors used phrases like "you people," "40 acres and a mule," and referred to him as the "black Otis;" and (2) on December 4, 2002, when he cross-filed a charge of discrimination with the EEOC and the Illinois Department of Human Rights.

The city also does not dispute that under prong two, King has identified four adverse employment actions: (1) on June 21, 2002, assistant superintendent Arthur Vanick suspended King for speaking in a "belligerent and insubordinate manner," (2) on December 10, 2002, King was suspended twice, once for failing to report to his supervisor on November 25, 2002, that he was leaving his truck to go to the bathroom, and separately for being tardy, failing to report to his supervisor, and for leaving without authorization, all on December 3, 2002; (3) on December 20,

2002, King was suspended for allegedly striking his supervisor and refusing a drug and alcohol test; and (4) on January 31, 2003, King was terminated for the December 20, 2002, incidents.

The court notes that King, on occasion, has identified other potentially protected activities and adverse employment actions. For instance, in the complaint he alleges: (a) repeated complaints to supervisors beginning in 2001 about racial slurs directed at him; (b) a letter to assistant superintendant Vanick, again about the racial slurs directed at him; (c) a July 3, 2002, letter to Commissioner Sanchez in which he again detailed his allegations of racial discrimination; and (d) a suspension on July 31, 2002 for alleged insubordination. However, King never mentions these other incidents in his argument, nor does he attempt to show any causal connection between them. Therefore, the court limits its analysis to those incidents King argued in his brief: specifically, the protected activities on June 20 and December 4, 2002, and the adverse employment actions on June 21, December 10, December 20, 2002, and January 31, 2003. *See Hicks v. Midwest Transit, Inc.*, 500 F.3d 647, 653-54 (7th Cir. 2007) (courts need not scour the record to find genuine issues of material fact precluding summary judgment).

Because the parties concede the first two prongs under the direct method, the court need focus only on whether the plaintiff has identified evidence of a causal connection between his protected activities on June 20 and December 4, and the adverse employment actions on June 21, December 10, December 20, and January 31.

### A. *June 20 Letter to Personnel Department*

King contends that as a consequence of his June 20 letter to the city's personnel department, assistant superintendent Arthur Vanick suspended him for allegedly speaking in a "belligerent and insubordinate manner." King argues that the events are causally connected

because the suspension immediately followed the letter. Normally, a plaintiff may not rely solely upon temporal proximity to establish a causal connection. *See Squibb v. Memorial Med. Ctr.*, 497 F.3d 775, 787 n.9 (7th Cir. 2007) (timing alone is insufficient circumstantial evidence of causation). However, timing alone may sufficiently establish a causal connection where the period between the protected activity and adverse employment action is exceedingly short. *See McClendon v. Indiana Sugars, Inc.*, 108 F.3d 789, 796-97 (7th Cir. 1997) (adverse action occurred two days after protected activity).

The one-day time period King identified is exceedingly short—perhaps too short. For Vanick's conduct to have been retailiatory on June 21, he would have had to learn about King's June 20 letter in rather short order. Yet the city makes no argument that Vanick was unaware of the June 20 letter at the time he disciplined King on June 21, so the court need not address the issue further. As it stands, the period of time King identified is half the period of time in *McClendon*, and therefore he has sufficiently established a causal connection.

### B. December 4 Charge Filed with the Ill. Dept. of Human Rights & EEOC

On December 4, 2002, King filed a charge of racial discrimination with the Illinois Department of Human Rights, cross-filed with the EEOC. King contends that he was retaliated against one week later on December 10, 2002, when he received two separate suspensions for conduct that had occurred earlier—one for his failure on November 25, 2002, to report to his supervisor that he was going to the bathroom, and one for being tardy on December 3, 2002, as well as failing to report to his supervisor and leaving work without permission that day. He contends that he was retaliated against again on December 20, 2002, when he was suspended and placed on indefinite paid administrative leave for allegedly striking a supervisor and refusing a

drug and alcohol test. Finally, according to King, the retaliation culminated when the city concluded its investigation of the December 20 incident and terminated him on January 31, 2003.

King attempts to rely on the temporal proximity between his December 4 charge and his suspensions on December 10 and December 20 to show that the suspensions were retaliatory. But it is undisputed that the city did not learn about King's December 4 charge of discrimination until December 30. Because it is undisputed that the city did not know about the December 4 charge until December 30, King's suspensions on December 10 and December 20 could not have been retaliatory.

As for his January 31 termination, weeks had passed since the city first learned about his charge of discrimination and therefore King may not rely solely upon temporal proximity to establish a casual connection between those events. *See Squibb*, 497 F.3d at 787 ("'other circumstances must also be present which reasonably suggest that the two events are somehow related to one another'") (quoting *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000). King fails even to acknowledge that timing alone cannot establish a causal connection, let alone does he identify any "other circumstances." As it stands, King offers no argument that any of his evidence establishes that his termination was related to the city's discovery of his charge of discrimination on December 30, as opposed to the natural consequence of his suspension and paid administrative leave that began on December 20.

In summary, King has sufficiently identified a causal connection between his June 20 letter to the city's personnel department and his subsequent suspension the following day, and therefore the city's motion for summary judgment on that portion of Count III is denied. King has not established a causal connection between his December 4 charge of discrimination and his

suspensions on December 10, December 20, or his termination on January 31, and therefore the city's motion for summary judgment on those portions of Count III (the suspensions) and on the entirety of Count IV (the termination) is granted.

## CONCLUSION

The city's motion for summary judgment on King's hostile work environment claim (Count I) and on his claim of retaliation based upon his June 21, 2002, suspension (part of Count III) is denied. The motion is granted on King's disparate treatment claims (Counts II & V), the retaliation claims based upon his suspensions on December 10 and 20, 2002 (remainder of Count III) and his termination on January 31, 2003 (Count IV). The parties shall report for a status hearing on December 20, 2007, and be prepared to set this matter for trial.

ENTER:

DATE: December 11, 2007

_Blanche M. Manning_
Blanche M. Manning
United States District Judge